E. H. SPRATT, Appellee, v. M. DWYER, Appellant.

**PARTNERSHIP:** Settlement of Accounts—Conclusiveness. A set-
tlement between partners of partnership accounts, without fraud
or mistake, is a finality, especially when such settlement has been
ratified and affirmed by the conduct of the parties.

*Appeal from Iowa District Court.*—HON. R. P. HOWELL,
Judge.

MONDAY, MARCH 22, 1915.

REHEARING DENIED FRIDAY, SEPTEMBER 24, 1915.

ACTION for an accounting. Plea of settlement. Decree
for the plaintiff. Defendant appeals.—*Reversed* and *Re-
manded.*

*B. F. Swisher* and *Ranck & Bradley,* for appellee.

*W. E. Wallace* and *Wade, Dutcher & Davis,* for appel-
lant.

GAYNOR, J.—This is an action for an accounting and to
set aside certain deeds made by plaintiff to defendant.

The plaintiff alleges in his petition substantially as fol-
lows:  On or about the 1st day of February, 1904, plaintiff
and defendant entered into a partnership in the business of
buying and selling horses, mules, cattle, sheep and hogs, and
buying and selling land, buying and harvesting hay and grain
of various kinds, and other matters pertaining to the business
of farming and stock raising, and continued to conduct said
business as partners until the month of October, 1908; the
agreement of partnership was oral, and the understanding
was that each should share equally in the profits and losses,

after deducting the expenses and cost of conducting the business; either party loaning money to the partnership should receive 8 per cent. interest per annum thereon, during the time the partnership used such money; many transactions were had during that period under the firm name of Spratt & Dwyer. During the time said partnership continued, the business was conducted and practically all the stock handled by the plaintiff. The same was purchased by him, cared for, fed, sold and traded, or disposed of, under his direction. All the stock bought by said partnership was purchased by the plaintiff and sold or traded by him personally, with the exception of two public sales in the years of 1904 and 1905. During the term of said partnership, the defendant was engaged in the banking business. All the stock, grain, etc., bought by the plaintiff was paid for at the time of purchase by checks drawn by the plaintiff on the Parnell Savings Bank, and signed by the plaintiff individually. This was done in pursuance of an oral agreement between the parties. During all the time said business was conducted, all money received by the plaintiff herein for stock, grain, and other partnership property which he sold was turned over by the plaintiff to the defendant, and all notes and mortgages taken by the plaintiff for said firm, in payment for property sold by him, were turned over to the defendant. Many of the notes were made payable to the firm of Spratt & Dwyer. During the existence of said partnership, almost entirely through the efforts and work of the plaintiff herein in buying and feeding and selling stock, and buying, harvesting and selling grain, a large amount of money was made by said firm. The profits from buying and selling horses and mules were about $6,000; from buying, selling and feeding cattle, about $8,000; and from buying, selling and feeding hogs and sheep, about $5,000. There was a profit on the sale of land of about $700. The profits or earnings of said partnership, during said period, were about $20,000. The plaintiff received, during the time said partnership business was conducted, about the sum of $3,000, which he used for the

purpose of making improvements upon his land and paying
interest charges. During the time said business was conducted,
the defendant induced the plaintiff, by cunning, false and
fraudulent statements and representations regarding the ac-
counts of said firm and the interest and standing of said busi-
ness, with reference to the partnership business, to sign certain
notes which were made payable to the defendant, and which
were taken and held by him. The notes were secured without
any real consideration. At the time these notes were given,
the defendant promised that, if it was discovered that these
notes or any of them were incorrect, either as to the amount
or number, they should be corrected. On May 7, 1908, the
defendant secured from the plaintiff a certain promissory note,
signed by plaintiff, for the sum of $8,648.53, payable to the
defendant. This note was secured by means of statements
and representations that the note would be used for the pur-
pose of raising money to be invested in Colorado and Dakota
land, from which it was claimed a large profit would be
derived. After defendant had secured said note, the plaintiff
went to Dakota to purchase land and purchased land in Lyman
county under a contract, and paid thereon the sum of $500.
Defendant then refused to permit any further payments to
be made upon the land, and refused to carry out the proposi-
tion to invest the money secured by means of said note, and
told the plaintiff that he (the plaintiff) was indebted to the
defendant in that sum, and said that the indebtedness was
evidenced by various other notes which the defendant had
secured from the plaintiff, as hereinbefore stated. There-
after, in the fall of 1908, the defendant, by intimidation
and false statements and threats, induced, frightened and
coerced the plaintiff into executing a warranty deed to cer-
tain land owned by the plaintiff, the consideration named
in the deed being $23,705. Said land was, at the time, reason-
ably worth on the market $30,000, and the encumbrance at the
time was $12,500; so the plaintiff's equity therein was $17,500.
The plaintiff alleges that he believes that the amount he is

entitled to as his portion of the profits and earnings of said partnership business, during the time said firm was engaged in business, and for the rent of the land and for his services during said period of time would equal the sum of $15,000, and he therefore desires an accounting, and prays that an accounting be had to determine the amount due him from the partnership, and that he have judgment for $15,000, and a decree setting aside the deeds executed by him to the defendant.

The defendant admits that, on or about the 1st day of March, 1904, he entered into an oral agreement with the plaintiff, whereby he agreed to furnish the plaintiff money for the purpose of buying two or three carloads of cattle, and that he was to receive, as compensation therefor, interest at the rate of 8 per cent. per annum upon the money so advanced, the cattle to be handled and sold by the plaintiff for the benefit of plaintiff and defendant; that they were to share equally in the profits of said transaction. Defendant admits that plaintiff continued to purchase cattle, horses, mules, hogs and sheep until May, 1908, and to sell the same for the account of said parties, but that no further or other agreement, with reference to said business, was made by the parties. Admits that all the stock handled by said partnership was purchased and disposed of by the plaintiff. Admits that, during the time said partnership continued, most of the stock bought by the plaintiff for said firm was paid for by checks drawn by the plaintiff on the Parnell Savings Bank and signed by the plaintiff individually, under an oral agreement between the parties that this method of business should be pursued. Defendant admits that, on the 27th day of May, 1908, the plaintiff executed and delivered to him his promissory note for $8,648.53, due one year after date, but denies that the same was obtained by any fraud or by any fraudulent means. He admits that, on September 30, 1908, the plaintiff conveyed to defendant certain real estate, but denies all alleged fraud in connection therewith. Defendant denies each and every other

allegation, and especially denies that he has, at any time, made any fraudulent representations to the plaintiff, or deceived the plaintiff or practiced any fraud upon him whatsoever, and denies that he is indebted to the plaintiff.

The defendant, for a separate defense, alleges that, on the 27th day of May, 1908, a full settlement of all matters involved in this action and all transactions between the parties was had and that, in pursuance of said settlement, and to cover the balance which was mutually agreed upon between the said parties as the amount due from the plaintiff to the defendant, the plaintiff made and executed to the defendant the said note of $8,648.53, and executed to defendant a certain mortgage to secure the same; that said note so given was, on the 30th day of September, 1908, fully paid by the plaintiff. Defendant says that said settlement was a partial settlement only, in that it involved only such transactions as occurred prior to the time of entering into the same, and defendant says that, by reason of said settlement, plaintiff is not entitled to an accounting as to any transaction between them which was prior to the making of said settlement; that plaintiff acquiesced in said settlement and is estopped from disputing it. Defendant further says that subsequent to said settlement, to wit, May 27, 1908, no business has been transacted by the firm, except the winding up of the transactions between the plaintiff and defendant after said date; that the partnership was dissolved on that date; that since the said settlement, defendant has received, of moneys belonging to the firm, of which the plaintiff is entitled to receive one-half, the sum of $3,734.36, and alleges that he has paid out, on accounts of said firm, as an offset against said amount received, the sum of $3,293.75, from which it would appear that a balance is due the plaintiff on this admission; but to this defendant pleads a setoff, to which attention will be hereinafter called.

The plaintiff for reply denies that the settlement claimed by defendant was a full settlement of all matters involved in this action and of all transactions between the plaintiff and

defendant. Denies that the settlement was mutually agreed to, and denies that he acknowledged that he owed the defendant the amount named in the note which defendant secured from the plaintiff and which plaintiff secured by a mortgage, but alleges the fact to be that, at the time of the alleged settlement, plaintiff denied that he owed the defendant the amount claimed and remonstrated against giving the note which defendant secured; that many of the notes which defendant held, which were computed by defendant in arriving at the aggregate amount for which the note was given, $8,648.53, were fraudulent and secured from the plaintiff by means of misrepresentations and trickery, and that said settlement and said note were given against his will, under threats made by the defendant. Plaintiff further alleges that, at the time said settlement was made, the defendant agreed with the plaintiff that if it was afterwards found that any mistakes were made, or errors existed, or that there was anything wrong with the computation or figures or in making said settlement, he would make the same right, and would pay to the plaintiff what he found he was entitled to, cancel said mortgage, and return said note. Plaintiff further alleges that the contract and agreement made by him with the defendant, by which he agreed to sell certain land to the defendant, were afterwards consummated by the execution of deeds by him to the defendant, but these deeds and the contracts were also obtained by false representations and false statements, and by means of power and influence exercised over the plaintiff by the defendant, and by reason of duress and undue influence, and alleges that whatever settlement was made between the parties was obtained by the defendant fraudulently; that plaintiff never agreed to the thing.

Upon the issues thus tendered, the cause was tried to the court, and a judgment and decree entered for the plaintiff against the defendant for the sum of $4,137.14, with interest thereon at six per cent. from May 23, 1910, and the costs of the action. No accounting was made between the parties as

a basis for such finding, nor was there any finding by the court in the record as to whether there was or was not a settlement between the parties. We assume, however, that the court found adversely to the defendant on the question of settlement. The question of settlement stands at the threshold, and challenges our attention first.

If the record discloses that the parties entered into a settlement of all matters existing between them on May 27, 1908, and that, in consummation of such settlement, the

PARTNERSHIP: settlement of accounts: conclusiveness.

plaintiff executed and delivered to the defendant the note for $8,648.53 and secured the same by mortgage, and thereafter conveyed to the plaintiff certain real estate in satisfaction of the note and mortgage so delivered; that the land at the time was encumbered by mortgages given by the plaintiff; that the defendant surrendered the note given in settlement to the plaintiff, cancelled the mortgage, and surrendered to the plaintiff the notes held by him against the plaintiff, which entered into the consideration of this note for $8,648.53, and has since then paid off the encumbrance upon the land deeded, it will not be necessary for us to enter into any accounting between the parties prior to the date of said settlement. A settlement is a contract. When mutually entered into between both parties, without fraud or mistake, it is as binding as any other contract, especially where it has been acquiesced in by both parties subsequent to the making of the settlement.

That there was a general settlement made between the parties of all the matters existing between them prior to the 27th day of May, 1908, there can be no question under this record. Plaintiff, however, claims that it was procured by fraud and misrepresentation and coercion, and by reason of the influence which the defendant exercised over him at the time. Plaintiff further contends that, at the time of the execution of some of the instruments involved in the consummation of the settlement, he was under the influence of intoxicating liquors to such an extent that he was not capable of

transacting business. These are all matters of fact to be determined from an examination of the record.

It appears from this record that these parties commenced business together about the 1st of February, 1904; that the business consisted in buying and selling live stock of all kinds and other business; that the plaintiff herein did all the buying and selling, and used his own judgment as to when and what to buy and when and what to sell, and fixed the price in each instance; that in the buying and selling and handling of this property, expenses were incurred, both great and small; that the plaintiff undertook to deliver to the defendant the proceeds of all sales made by him. He was not required to account to the defendant, nor to furnish the defendant an itemized statement at any time as to what the property cost, the expenses incurred in caring for it or the amount received upon the sale, and did not. He paid to the defendant, when he did pay to the defendant, only such sum as he considered to be the amount realized from the sale. Plaintiff kept no books concerning his transactions outside. The defendant claims to have kept an accurate account of all moneys received by him from the plaintiff. It appears that an account was kept at the bank in plaintiff's name. Upon this account, plaintiff checked at will, drew checks to pay personal expenses as well as the expenses of the firm; and whenever there was need of money to keep this account good, it was put into the bank by the defendant. Defendant kept an account of this, or claimed to. This method of doing business continued until the winter or spring of 1908, at which time the defendant called for a settlement of their accounts. They agreed upon one Van Ness, who was the bookkeeper for the defendant in defendant's lumber business. Each party brought in all his books, accounts and papers relating to the firm transactions. This was along in the winter of 1908. Van Ness figured their accounts from the data given him by both parties and subsequently struck a balance, from which it appeared that in the

partnership business, the plaintiff was indebted to the defendant in the sum of $720.

Plaintiff says in his testimony:

"When I gave this note, I understood it was for that much money Dwyer had put in more than I in the business, and it was given for the figures Van Ness had arrived at, after he had figured up both our accounts, and after I gave the note, I found that I had paid some checks on the Kansas City cattle that I had not been given credit for, and I found there was an error in our settlement to that amount. He gave me credit for this." He says: "I was told to bring in my books and checks early in the winter of 1908, so they could be figured. This was in January, 1908, or December, 1907."

He further said:

"We were always talking about checking up and talking of where we were at, but never got to it until 1908. The first thing I knew about this settlement about to be made, I came into the lumber office and saw a lot of Dwyer's checks and asked Van Ness what he was doing. I asked him if he was figuring Dwyer's side of the business. He then asked me if Dwyer told me he was going to do it. I told him he had. When he got his side figured, he told me that he had the thing pretty well figured, and for me to fetch in my books. I used to go into the lumber yard about every day after that. I dropped in and asked Van Ness how he was coming along. He kept figuring along until something came up he didn't know how it went, and I told him what I thought. Sometimes Dwyer came in and told him. So one evening he said he had finished."

It appears that that time was soon after the note for $720 was given.

Plaintiff further testifies:

"Q. You took in all the checks you had so far as you know? A. Yes, sir. Q. You took in everything you had

that bore on this partnership so far as you know? A. Yes, sir."

At another place in his testimony he said:

"Q. By the way, you had turned in your checks and things into Van Ness to be figured? A. Yes, sir, all the truck I had. Q. You had taken in these checks that you had? A. I took everything I had in the business and turned it over to him. Q. What did you do that for? A. He wanted me to bring them, show what knowledge I had, show what I had, and what books I had. Q. Did he tell you what for? A. Figure them. Q. He told you he was checking up this account with a view of making a settlement? A. Yes, sir. He wanted me to bring in my books and checks and everything I had bearing upon the account, and I did so. I went in where Van Ness was figuring the account day after day and talked to him every day."

Van Ness testified in substance:

"I first started on the Spratt & Dwyer account in the winter of 1907 and 1908. My first conversation was with Dwyer about figuring the account. After that I talked with Spratt. He and Dwyer were talking about a settlement. They both wanted a settlement. Spratt said, 'We will have to get some good man to figure these books and pay him for it.' They suggested different names. Mr. Spratt turned to me and asked me if I would have time to figure the account. I told him if it was satisfactory, I would try to do it. He said he would as soon trust me as anybody. I told him to bring his books and papers pertaining to the partnership account. He brought them in. I did most of the figuring up to April 4, 1908, at the lumber office. I think I did all of it at the lumber office. Both parties were present and discussed the accounts. I figured up the partnership account. Then I discovered an error, which, with interest and all, figured $20.92. This was then taken into account. Other

items were brought in and the account changed to meet the conditions as they were placed before me by the parties."

He then proceeds with a detailed account as to how the settlement was made, from which it appears that each party took an active part in the settlement. Sometime after this April settlement, he says Spratt came to him and told him the settlement was wrong. "He said that he did not have credit for the Kansas cattle, so I took the books and went out to Dwyer's house. I was some time there, straightening the discrepancy." He says there was no claim made by Spratt between the settlement of April 4th and May 27th that he had not received the amount or the items which he had been charged with having received in the April settlement. Nor was there any claim made that he had put in the business more than he had been given credit for, except he thought he ought to be allowed more for groceries in the haymarketing season. At the May 27th settlement, the April 4th settlement stood, with the corrections as made, and in addition, there were taken into account thirty notes in all which Spratt owed to Dwyer personally. "The notes were all in my possession on the 26th of May, 1908, and I figured them over that day. Spratt and Dwyer were both present. Dwyer handed me the notes to figure, and made a list of them. Spratt was standing by and the notes were lying on my desk. It was at the end of this settlement that the note for $8,648.53 was given, as a balance due from Spratt to Dwyer on the full settlement. After that, both of the parties figured over the account several times during the summer of 1908. Mr. Rohret was present with Mr. Spratt and myself at these times."

Spratt testifies:

"After Dwyer and I had settled in Parnell, Mr. Rohret went over with me to Parnell to see how things were figured. This was in the fall of 1908. It was in the winter after the settlement in May, and after I gave the big note."

It appears that at the May settlement, the balance found due from the plaintiff to the defendant was $9,448.53; that before the note was executed, plaintiff received a credit of $800 on this amount as his share in what was known as the McShane land deal, leaving a balance of $8,648.53, for which the note was given.

It appears that afterwards, on the 19th day of September, 1908, plaintiff and defendant entered into an agreement by which the plaintiff agreed to sell and convey to the defendant certain real estate belonging to the plaintiff for the sum of $85 per acre, to be paid on the 1st day of March, 1909; that on the 28th day of September, they entered into another contract, by which the plaintiff agreed to sell to the defendant certain real estate mentioned in the contract, for the sum of $16,905, to be paid on the 1st day of March, 1909. In pursuance of said contracts, on the 30th day of September, 1908, the plaintiff executed to defendant a deed for said real estate.

Plaintiff testifies:

"After I gave these two contracts for the land, I shortly afterwards gave him a deed. One day the defendant drove over to Oxford. I went to see Mr. Rohret and consulted him before I gave the deeds. I went to Oxford to see Rohret. He was president of the Farmers Bank in Oxford. We went to Oxford and found he had gone to Iowa City. We found him at Iowa City, and I told him what I came for. We started on the train for Marengo. I talked with Rohret. I told Rohret I was figuring on deeding the land to Dwyer. We went to Colson's office and figured the amount that was coming to me, if anything, after the mortgage and other things had been paid. Defendant agreed to pay a certain price for the land. There were encumbrances against it. He assumed these encumbrances, and that would apply to the purchase price."

He was then asked this question:

"In figuring up the purchase price of this, there was included the mortgage in the Scott county bank? A. Yes, sir. Before I delivered the deed to Mr. Dwyer, I gave him credit on the purchase price for $2,250 and interest, due the First National Bank on the mortgage it held against my land. I gave him credit on the purchase price for a $2,000 mortgage that the Farmers Loan & Trust Company held against the land. Credit for $8,000 mortgage that the Scott County Savings Bank held against the land. There was dispute about the taxes against my land, but that is about the way the deal is closed up."

He was asked this question:

"You gave him credit for the mortgage you gave to Mr. Dwyer for $8,648.53 and interest, didn't you? A. Yes, sir. Q. And gave him credit for the mortgage you had executed to him for $700, didn't you? A. I think so. And I gave him credit for the judgment for $29.55 that had been rendered against me. I gave him credit for $362 and interest for a judgment that was against me. I gave him credit for $110 taxes and interest that was due and against me. Mr. Rohret was there representing me. Mr. Rohret and Mr. Colson did some figuring. I gave the deed after the figuring was done."

Thus it appears from this record that plaintiff and defendant had been in business together for about four years; that the plaintiff had failed to keep anything approximating an accurate account of his side of the controversy; that they agreed to a settlement; that a settlement was made; that the figures involved in the settlement were frequently reviewed thereafter; that Rohret, who represented the plaintiff, after a full investigation, said that he found nothing that could be urged in plaintiff's favor under the first settle-

ment; that he could find nothing, unless it might be found in the notes involved in the second settlement; that he had the notes involved in this settlement for the plaintiff and has never returned them. Nor was any complaint made, nor does anything appear tending to show that there was anything unfair or wrong or corrupt in the securing of these notes by the defendant from the plaintiff. At the time this settlement was made, all these notes that were involved in the settlement were before the plaintiff, and he then made no complaint. He afterwards gave his note for the amount of the May settlement; he afterwards paid this note by deeding to the defendant the land hereinbefore referred to; the note was then surrendered to him; the defendant assumed the payment of the mortgages and judgments against the land. It appears that subsequently improvements were placed upon the land by the defendant, and that this action was not brought until nearly a year and ten months after the settlement. We think a complete settlement was made between the parties of all dealings between them up to May 27, 1908, and that this settlement has been ratified and affirmed by the conduct of the parties thereafter.

There is absolutely nothing in this record tending to support plaintiff's contention that the defendant acted fraudulently in respect to any of these matters, or that the plaintiff was intimidated by the defendant, or that undue influence was used to induce him to act. Before the settlement was finally consummated by the making of the deeds, he had legal counsel and had the matters involved in the settlement reviewed, and his contention that he was intoxicated at any of the times these transactions took place is wholly without foundation in the record.

As to matters transpiring since said settlement, we find nothing in plaintiff's favor to justify us in allowing him anything upon that issue.

We might say that this record has been exceedingly difficult to handle. The facts involving the statements are so

interwoven with the trial upon the main issue that it has required a reading of the entire record in order to ascertain, with any definiteness, the real facts involved in the settlement. However, we have read the whole record with care and have reached the conclusion herein set out; and upon this record, we think the court erred in not finding that all matters between the plaintiff and defendant, before the 27th day of May, 1908, were fully settled and adjusted between them, and erred in rendering judgment for the plaintiff against the defendant for any amount.

We find, upon the whole record, that there is nothing due the plaintiff from the defendant, and the judgment is therefore reversed and remanded, for a decree in accordance with this opinion.—*Reversed* and *Remanded.*

DEEMER, C. J., LADD and SALINGER, JJ., concur.